**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

--------------------------------------------------------X
MARUBENI CORPORATION,

                         Plaintiff,

              CIVIL ACTION NO. _____

         v.

              **ADMIRALTY**

INTERGIS CO., LTD.


                         Defendant,
--------------------------------------------------------X

## <u>VERIFIED COMPLAINT</u>

Plaintiff, MARUBENI CORPORATION ("Marubeni"), by its attorneys, K&L GATES, LLP, as and for its Verified Complaint against the Defendant INTERGIS CO., LTD. ("Intergis"), alleges upon information and belief as follows:

<u>JURISDICTION</u>

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

2.      The Court also has jurisdiction pursuant to 9 U.S.C. § 1, *et seq.* and 9 U.S.C. § 201, *et seq.*

3.      Marubeni brings this action to obtain security for a maritime claim pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule B") seeking an order and writ of maritime attachment and garnishment over a vessel which is presently located within the District.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

<u>THE PARTIES</u>

5.      At all times relevant hereto, Plaintiff Marubeni is and was a foreign business entity organized under the laws of Japan, with its principal place of business in Tokyo, Japan.

6.      At all times relevant hereto, Defendant Intergis is and was a foreign business entity organized under the laws of South Korea, its principal place of business in Busan, South Korea.  Upon information and belief, Intergis is the Beneficial Owner, Ship Manager, Commercial Manager, and ISM Manager of the M/V DK INITIO (IMO No. 9528160) (the "Vessel").   A true and correct copy of the Vessel's Equasis report is attached hereto as Exhibit "A".   According to Equasis, the Registered Owner of the Vessel is DKC SA, with an address at the "Care of Intergis Co Ltd. . . ."   Additionally, Intergis' website[1] lists the Vessel as a vessel in Intergis' fleet.

7.      The Vessel is now, or shortly will be, within the jurisdiction of this Court.

<u>FACTS</u>

8.      Marubeni and Intergis entered into a voyage charter on an amended Baltimore Form C charter party form dated January 24, 2014 (the "Charterparty").   A true and correct copy of the Charterparty is attached as Exhibit "B."

9.      Under the Charterparty, Marubeni chartered from Intergis a bulk carrier to be nominated (by Intergis) to load 60,000 metric tons of soybeans in bulk in Brazil for carriage to China.

10.      Intergis subsequently nominated the vessel under the Charterparty to be the M/V ADAMASTOS (the "ADAMASTOS").

---

[1] Available at, http://www.intergis.co.kr/eng/business/ship.asp

11.     The Charterparty expressly provided as follows:

    a.   Clause 1

"That the said **vessel, being tight, staunch and strong and in every way fit for the voyage** shall with all convenient speed proceed . . . ." (emphasis added)

12.     A booking note (no. 108465) dated 24 January 2014, recorded the terms of the Charterparty, expressly provided:

"**VSL SUITABLE IN ALL RESPECT FOR THE LOADING, CARRIAGE AND DISCHARGE OF BULK HSS FROM SOUTH AMERICA TO CHINA**, VSL TO BE CLASSED LLOYDS 100+A1 OR EQUIV."  (emphasis added)

13.     The ADAMASTOS arrived at the load port in Brazil on July 31, 2014, and by August 6, 2014, had loaded 59,674.680 metric tons of soybeans (the "Cargo").

14.     Marubeni was at all material times the owner of the Cargo and/or at all material times the Cargo was shipped at its risk.

15.     On August 5, 2014, the ADAMASTOS was inspected by local maritime authorities, who found forty-two deficiencies with the ADAMASTOS.

16.     On August 6, 2014, the ADAMASTOS, whilst still loading her cargo, broke free of her moorings and grounded.

17.     The ADAMASTOS was refloated, but was not permitted to re-berth alongside to load any remaining cargo without (a) a letter of guarantee in the sum of BRL1 million and (b) an approved berthing plan.  The ADAMASTOS was ordered to proceed to, and anchor in, the outer anchorage.

18.     Thereafter, despite repeated requests by Marubeni that Intergis perform its contractual and statutory duties to properly care for and deliver the Cargo, Intergis took no (or no adequate) steps to remedy the deficiencies in the ADAMASTOS; did not

complete the loading of the ADAMASTOS; did not commence the voyage or carry the Cargo on board the ADAMASTOS to China; and eventually abandoned the ADAMASTOS, the contractual voyage, and/or the Cargo itself.

19.     On December 18, 2014, more than four months after the ADAMASTOS broke free of her moorings and grounded, Intergis was notified of the cargo's deteriorating condition (i.e., that "live and dead insects and larvaes [were found] in holds 1 and 7 and increasing temperatures suggest[ed] the beginning of deterioration.").

20.     Marubeni, through its subsidiary Marubeni America Corp., paid the original seller of the soybeans US$32,626,534.54, plus an additional US$138,662.77 in interest charges for late payment.  A true and correct copy of the January 23, 2014 sale and purchase agreement is attached as Exhibit "C."

21.      Marubeni was forced to enter into a distress sale of the Cargo and sold it for US$3,350,000 pursuant to a sale and purchase agreement dated April 2, 2015.  A true and correct copy of the April 2, 2015 sale and purchase agreement is attached as Exhibit "D."  The Cargo was sold on an "as is, where is" basis onboard the ADAMASTOS.

22.     Had the Cargo been carried to its contractual port of discharge under the Charterparty, Marubeni would have sold the Cargo for US$36,000,000 DES (delivery ex ship).  Alternatively, the market value of the Cargo was US$36,000,000 CIF (cost, insurance and freight) at a Chinese port in late August/early September 2014.

AS FOR A CAUSE OF ACTION FOR
BREACH OF THE MARITIME CONTRACTS

23.     Pursuant to the express terms and conditions of the Charterparty and the terms implied by applicable statute therein, Intergis agreed to provide a seaworthy and suitable vessel, and to properly care for and deliver the Cargo from Brazil to China.

24.     Intergis breached the express and implied terms of the Charterparty by:

    a.  failing to take any or any adequate steps to remedy the deficiencies in the ADAMASTOS;

    b.  failing to complete the loading of the ADAMASTOS;

    c.  failing to commence the voyage to China;

    d.  failing to carry the Cargo onboard the ADAMASTOS to China;

    e.  abandoning the ADAMASTOS;

    f.  abandoning the contractual voyage;

    g.  abandoning the carriage of the Cargo; and/or

    h.  abandoning the Cargo itself.

25.     Intergis' breaches of the express and implied terms of the Charterparty caused Marubeni damages in an amount in excess of US$36,000,000.

26.     Intergis is liable for Marubeni's damages under the Charterparty.

<u>PENDING ARBITRATION PROCEEDINGS IN LONDON</u>

27.     Pursuant to the terms of the Charterparty, Marubeni initiated arbitration proceedings against Intergis and its affiliate, Dongkuk Steel Mill Group, in London, United Kingdom (the "London Arbitration") to recover its damages.

28.     Marubeni filed its Claim Submissions in the London Arbitration on April 29, 2016, alleging, *inter alia*, breaches by Intergis of the Chartparty as set out above.

29.     Marubeni seeks US$32,840,193.92 in the London Arbitration (US$36,000,000 value of the cargo, less US$3,350,000 recovered in the distress sale, plus certain commissions, fees, and interest payments).

30.     No security has been provided in the London Arbitration.

## RULE B ATTACHMENT

31.     Marubeni repeats and realleges the foregoing paragraphs as if fully set-forth herein.

32.     Marubeni brings this action solely to obtain quasi in rem jurisdiction over Intergis and security for its claim in the London Arbitration.

33.     Upon information and belief, Intergis cannot be found within this District within the meaning of Rule B (see accompanying Declaration of Elizabeth A. Gilman).

34.     However, Intergis' property, namely, the M/V DK INITIO (IMO No. 9528160), is found within this District.

35.     The total amount to be restrained and attached as security for Marubeni's claim is US$32,840,193.92, together with interest and costs as provided for in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

36.     Because this Verified Complaint sets forth an *in personam* maritime claim against the Defendant and because the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment and garnishment are met and Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against Defendant and/or *quasi in rem* jurisdiction over the property of the Defendant so that an eventual judgment and/or award can be satisfied.

37.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Marubeni prays as follows:

38.     That an order of maritime attachment and garnishment may issue against the Defendant in accordance with Supplemental Admiralty Rule B; and if Defendant cannot be found within this district, that its goods, chattels and credits within the District, and particularly the Vessel, M/V DK INITIO (IMO No. 9528160), may be attached in an amount sufficient to answer Marubeni's claim;

39.     That the Defendant, and any other person claiming an interest therein, be summoned to appear and answer this Verified Complaint;

40.     That judgment be entered in favor of Marubeni against Defendant in the amount of US$32,840,193.92, together with interest and costs as provided for in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.;

41.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and,

42.     That Plaintiff have such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Houston, Texas
      July 25, 2016

K&L GATES, LLP

By:

/s/ Elizabeth A. Gilman
Elizabeth A. Gilman
**Attorney in Charge**
State Bar No. 24069265
SDOT:  006637
1000 Main St., Suite 2550
Houston, TX 77002
Tel:  (713) 815-7300
Email: beth.gilman@klgates.com

Of Counsel:
Michael G. Chalos
S.D. Texas Federal Bar No. 2304888
599 Lexington Ave.
New York, NY 10022
Tel:  212.536.4097
Fax:  212.536.3901
Email:  michael.chalos@klgates.com

George Kontakis
(*pro hac vice* application forthcoming)
Federal Bar No. GK-0484
599 Lexington Ave.
New York, NY 10022
Tel:  212.536.4021
Fax:  212.536.3901
Email:  george.kontakis@klgates.com

**ATTORNEYS FOR PLAINTIFF
MARUBENI CORPORATION**

# EXHIBIT A



# Equasis - Ship folder
# DK INITIO
*imo: 9528160*

## • Disclaimers

Neither Equasis nor its officers or employees shall be under any liability or responsibility whatsoever regarding the data displayed on this site, including hyperlinks or printing. Whist Equasis will make every effort to provide accurate information, it does not rule out the possibility of inadvertent omissions or inaccuracies.

Neither Equasis nor its officers or employees accept any responsibility and shall not be liable for any loss to any person caused by or arising from any information displayed on this site.

Only factual information is displayed in Equasis. Information does not undergo any changes by Equasis. Special attention has been paid to the accuracy of the data. Data is regularly updated in order to help ensure that information remains as reliable as possible. The frequency of updates varies from provider to provider.

No part of the information contained in or from the Equasis website may be stored in a retrieval system, or transmitted in any form, or by any means without prior permission in writing from Equasis.

The following actions are forbidden:
- • Bulk-downloading of data contained on the site ;
- • Use of downloaded data for financial gain ;
- • Use of a robot or similar remote device to download large batches of data.

The above list is not exhaustive, and it should be noted that Equasis continually monitors the activity on its website and if misuse is detected, then the user's account can be locked without prior notice.

# Ship informations

## • Ship particulars

| Information | | Since |
|---|---|---|
| IMO number : | 9528160 | |
| Name of ship : | DK INITIO | (since 01/10/2010) |
| Call sign : | H3UU | |
| MMSI : | 356411000 | |
| Gross tonnage : | 34349 | (since 01/10/2010) |
| DWT : | 58655 | |
| Type of ship : | Bulk Carrier | (since 01/10/2010) |
| Year of build : | 2010 | |
| Flag : | Panama | (since 01/09/2010) |
| Status of ship : | In Service/Commission | (since 01/10/2010) |
| Last update : | 31/05/2016 | |

## • Management detail

| IMO | Role | Name of company | Address | Date of effect |
|-----|------|-----------------|---------|----------------|
| 5442432 | ISM Manager | INTERGIS CO LTD | Marine Center Building, 52, Chungjang-daero 9beon-gil, Jung-gu, Busan, 600-715, South Korea. | since 07/02/2016 |
| 5442432 | Ship manager/ Commercial manager | INTERGIS CO LTD | Marine Center Building, 52, Chungjang-daero 9beon-gil, Jung-gu, Busan, 600-715, South Korea. | since 01/09/2015 |
| 5442432 | Beneficial Owner | INTERGIS CO LTD | Marine Center Building, 52, Chungjang-daero 9beon-gil, Jung-gu, Busan, 600-715, South Korea. | since 17/10/2012 |
| 5566517 | Registered owner | DKC SA | Care of Intergis Co Ltd , Marine Center Building, 52, Chungjang-daero 9beon-gil, Jung-gu, Busan, 600-715, South Korea. | since 01/10/2010 |

## • Classification surveys

| Classification society | Date survey | Date next survey |
|------------------------|-------------|------------------|
| Korean Register of Shipping (IACS) | 18/09/2015 | 04/10/2020 |

## • Safety management certificate

| Classification society | Date survey | Date expiry | Date of status | Status | Reason | Type |
|------------------------|-------------|-------------|----------------|--------|--------|------|
| Korean Register of Shipping (IACS) | 07/02/2016 | 06/08/2016 | 07/02/2016 | Delivered | | Convention |

## • P&I information

| Name of P&I insurer | Recorded on |
|---------------------|-------------|
| North of England P&I Association | 23/06/2016 |

# Ship inspections

## • List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| Mediterranean MoU | Turkey | Kocaeli | 30/03/2016 | N | 0 | |
| US Coast Guard | United States of America | Houston, Texas | 07/12/2015 | N | 0 | 1 |
| Vina Del Mar MoU | Mexico | MANZANILLO COL | 13/11/2015 | N | 0 | |
| Tokyo MoU | Philippines | Surigao | 13/07/2015 | | | |
| Vina Del Mar MoU | Brazil | ITACURUCA | 29/11/2014 | N | 0 | |
| US Coast Guard | United States of America | Brownsville, Texas | 07/10/2014 | N | 0 | |
| Tokyo MoU | Philippines | Surigao | 16/05/2014 | | | |
| Tokyo MoU | Japan | Fukuoka | 17/10/2013 | | | |
| Tokyo MoU | Korea (Republic of) | Gwangyang | 19/06/2013 | | | |
| US Coast Guard | United States of America | Houston, Texas | 23/02/2013 | N | 0 | |
| Vina Del Mar MoU | Mexico | ALTAMIRA TAM | 20/02/2013 | N | 0 | |
| Paris MoU | Spain | Cartagena | 19/07/2012 | N | 0 | |
| Tokyo MoU | | | 26/10/2011 | | | |
| Tokyo MoU | | | 21/06/2011 | | | |
| Tokyo MoU | | | 25/03/2011 | | | |

# Ship history

## • Current and former name(s)

| Name of ship | Date of effect | Source |
|---|---|---|
| DK INITIO | since 01/10/2010 | IHS Maritime |

## • Current and former flag(s)

| Flag | Date of effect | Source |
|---|---|---|
| Panama | since 01/09/2010 | IHS Maritime |

## • Current and former classification status

| Classification society | Date of survey | Sources |
|---|---|---|
| Korean Register of Shipping (IACS) | 18/09/2015 | Korean Register of Shipping |
| Korean Register of Shipping (IACS) | 05/10/2010 | Korean Register of Shipping |

## • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| INTERGIS CO LTD | ISM Manager | since 07/02/2016 | |
| INTERGIS CO LTD | Ship manager/ Commercial manager | since 01/09/2015 | |
| STX MARINE SERVICE CO LTD | Ship manager/ Commercial manager | since 01/12/2014 | |
| INTERGIS CO LTD | Beneficial Owner | since 17/10/2012 | |
| HANJOO MARITIME CO LTD | ISM Manager | since 24/03/2011 | |
| HANJOO MARITIME CO LTD | Ship manager/ Commercial manager | since 01/10/2010 | |

## • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| DKC SA | Registered owner | since 01/10/2010 | |
| BLUE MINE PTE LTD | Ship manager/ Commercial manager | since 30/09/2010 | |
| JU MARINE SA | Ship manager/ Commercial manager | since 30/09/2010 | |
| DONGKUK MARINE CO LTD | Registered owner | since 30/09/2010 | |
| BLUE MINE PTE LTD | Registered owner | since 30/09/2010 | |
| JU MARINE SA | Registered owner | since 30/09/2010 | |
| BLUE MINE PTE LTD | Ship manager/ Commercial manager | since 30/08/2010 | |
| DONGKUK MARINE CO LTD | Beneficial Owner | since 15/07/2010 | |
| UNKNOWN | Beneficial Owner | since 29/04/2010 | |
| BLUE MINE PTE LTD | Beneficial Owner | since 24/04/2009 | |

# EXHIBIT B



FIRST
ORIGINAL

# BALTIMORE FORM C BERTH GRAIN CHARTER PARTY (Adapted 1963)

APPROVED BY NORTH AMERICAN EXPORT GRAIN ASSOCIATION, INCORPORATED, NEW YORK
NORTH AMERICAN SHIPPERS ASSOCIATION, LONDON
NEW YORK PRODUCE EXCHANGE, NEW YORK

Amended 1st July 1974

Oslo: ............................8th March ... ... ... ..........., 19 .... 2013

*It is this day Mutually Agreed*, between *INTERGIS CO. LTD (DONGKUK STEEL MILL GROUP), KOREA*    1

NERS ....................................................................................................................................... disponent owners/owners/time chartered owners of the    2

RIPTION
ESSEL ........................(flag) SS/MV      Dry Cargo/Tanker *"INTERGIS CO. LTD TBN"(see Clause 56)*................ Call Sign: .............................    3

built ...........................at............................................., of ............................................ tons of 2,240 lbs.    4

total deadweight, or thereabouts, on a Summer draft of ....................feet ....................inches salt water, and guaranteed ...............................    5

IFICATION    tons of 2,240 lbs., ........................percent more or less cargo capacity, quantity at owners' option, classed ............in.................,    6

now .........................................................................................................................................    7

.......................................................................................................................................    8

RTERERS    and *MARUBENI CORP.*......................................................................................... ,    9

Charterers, of *TOKYO, JAPAN* ...............................................................................................    10

     1.   That the said vessel, being tight, staunch and strong, and in every way fit for the voyage, shall with all convenient speed proceed  to : *one (1) safe berth RIO*    11

NG PORT(S)    *GRANDE, SAO FRANCISCO DO SUL, SANTOS with 42' draft basis 60,000 / 10%*.................................................................................................................    12

*or:*    13

*one (1) safe berth ARATU, basis 60,000 / 10%*

*Charterers' option to load at a second safe berth (always within same port) with shifting expenses, if any, to be for Charterers' account and time used for
shifting to count as laytime,*..........................

GO    and there load, always afloat, a full and complete cargo, in bulk, subject to limits above guaranteed, of WHEAT and/or CORN and/or RYE and/or SORGHUMS and/or    14

SOYBEANS, at Charterers' option. Charterers also have the option of loading ........................................................................................    15

1

one (1) cargo as follows:                                                                                                    16

..............................................................................................................................................................

60,000 metric tons 10% more or less in Owners' option bulk SOYBEANS, stowage factor about 48 cubic feet / metric ton without guarantee.   17

To be loaded in clean, clear and unobstructed main cargo holds, no wing tanks, or places that are inaccessible to Charterers' / Receivers' grabs.

Owners warrant the vessel is able to load, stow and carry the cargo, as described without any bagging, strapping or securing.

PATIONS          2.   ~~Cost of cargo separations, in excess of three, to be for Charterers' account.~~          18

CK OF
INESS            3.   a)   Master to advise (telegraphic address):   E-mail:   info@pasternakbaum.com and also load port agents 5 / 3 / 1 day(s) notice of   19

expected readiness at loading range when ~~vessel sails from last port on previous voyage~~ and also approximate quantity of cargo required. Master or Owners to advise   20

(~~telegraphic address:~~) info@pasternakbaum.com and also agents ...................... of any change in the vessel's expected time of arrival at loading range, whilst on passage.   21

NG PORT
ERS              b)   ~~Master to apply by radio to .................................................................................. (telegraphic address " ............... .................... .......................)~~   22

~~for first or sole loading port orders 96 hours before the vessel is due off at .................................................................. , and Charterers/Agents are to give first or~~   23
~~sole loading port orders by radio within 48 hours of receipt of Master's application, unless given earlier. If Master's application is received on a Saturday, the time allowed~~   24
~~to Charterers shall be 52 hours instead of 48 hours as above.~~   25

SEL              4.   Vessel to load under inspection of National Cargo Bureau, Inc., and a Grain Inspector holding a licence issued by the United States Department of Agriculture   26
CTION            pursuant to the U.S. Grain Standards Act, in U.S.A. ports, or of the Port Warden and a Grain Inspector employed by the Canada Department of Agriculture, in Canadian   27
ports, or the regulatory body pertaining to grain loading in the country the vessel is loading, at her expense, and to comply with their rules, not exceeding what   28
she can reasonably stow and carry over and above her Cabin, Tackle, Apparel, Provisions,

Fuel and Furniture, and being so loaded shall therewith proceed to   one (1) safe berth, one (1) safe port NORTH CHINA (NINGBO and NORTH) Charterers'   29

NATION           option one (1) safe berth, one (1) safe port SOUTH CHINA (Charterers guarantee minimum 13 metres salt water arrival draft for the 60,000 / 10%   30

The discharge port is to be named by Charterers soonest known but latest passing SINGAPORE.   .................................................................................   31

.......................................................................................................................................   as ordered on signing Bills of Lading, and deliver same,   32
IARGING          according to Bills of Lading, always afloat, ~~except where customary for vessels of similar size to lie safely aground~~, or at Charterers' option,  Master to apply by radio to   33
i) ORDERS

Charterers/Agents ~~(telegraphic address~~ .................................................................................................................................   )   34

~~for first or sole discharging port orders 96 hours before vessel is due off at .................~~   35
~~and Charterers/Agents are to give first or sole discharging port orders by radio within 48 hours of receipt of Master's application unless given earlier. If Master's application~~   36
~~is received on a Saturday the time allowed to Charterers or their Agents shall be 52 hours instead of 48 hours.~~   37

IT RATE(S)       5.   Rate of freight all per metric ton, free in / out, spout trimmed and as per elevator weights: ...................................................................................   38

Basis SANTOS 42' for 60,000 / 10%   .....  ...................................   39

2

*U.S.$ 39.75 (Thirty Nine Dollars and Seventy Five Cents United States Currency) basis NINGBO and NORTH* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

*U.S.$ 38.25 (Thirty Eight Dollars and Twenty Five Cents United States Currency) basis SOUTH of NINGBO* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*Basis RIO GRANDE, SAO FRANCISCO DO SUL 42' for 60,000 / 10%* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

*U.S.$ 40.00 (Forty Dollars United States Currency) basis NINGBO and NORTH*   43

*U.S.$ 38.50 (Thirty Eight Dollars and Fifty Cents United States Currency) basis SOUTH of NINGBO*

*Basis ARATU 60,000 / 10% where a displacement restriction of 88,450 apply*

*U.S.$ 40.75 (Forty Dollars and Seventy Five Cents United States Currency) basis NINGBO and NORTH*

*U.S.$ 39.25 (Thirty Nine Dollars and Twenty Five Cents United States Currency) basis SOUTH of NINGBO*

*All rates are per metric ton, free in / out, spout trimmed.*

*YANGTZE RIVER DISCHARGING CLAUSE:*
*(Lightening Clause)*

*In the event vessel is required to complete discharge at one (1) safe port in the YANGTZE RIVER, the discharge port is not to be above the Port of NANJING.*

*At lightening port / anchorage, the vessel's Notice of Readiness to be tendered and accepted at customary port / anchorage WIBON / WIPON / WIFPON / WCCON during working hours of 08:00 – 17:00 Monday to Friday and laytime is to commence at 08:00 hours the next working day after acceptance of Notice of Readiness and cease upon vessel completion of discharge at second discharging port in YANGTZE RIVER.*

*However, actual shifting time from the mouth of the river to final discharging port / berth or anchorage will be excluded from laytime. All ports disbursement for Owners' account, including tonnage dues.*

*The costs for lightening to be for the Charterers' / Receivers' account. Owners to pay port charges for the YANGTZE RIVER port.*

*Additional premium for discharge YANGTZE RIVER Port as described above is U.S.$ 1.50 (One Dollar and Fifty Cents United States Currency) per metric ton up to ZHANGJIAGANG and U.S.$ 2.00 (Two Dollars United States Currency) up to NANJING.*

*Any lightening / lighterage due to draft, all costs / risks for lightening to be for Charterers' / Receivers' account and time used to count as laytime.*

*Shifting time to count, even if the vessel shifting ordered by port authority.*

PORTS        6   ~~Charterers have the option to load the vessel at a second port at~~ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~extra~~ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

3

Orders for second port of loading, if used, to be given to Master 46

47

7    Charterers have the option to discharge the vessel at a second port at 48

extra 49

Orders for second port of discharge, if used, to be given to Master 50

ENT OF

CHT

8.    *See Clause 66* If vessel discharges in the UNITED KINGDOM including NORTHERN IRELAND, freight shall be payable concurrently with discharge, to Owners or their 51

designated Agents at _____ in British Sterling, on English weight delivered, less a deduction 52
for dirtage of 2 lbs. per 2000 lbs. of grain discharged if weighed at time of discharge by approved Hopper Scale in drafts of 2000 lbs. or over. 53
9.    For all other destinations freight shall be payable concurrently with discharge to Owners or their designated Agents at port or ports of discharge on outturn 54
weights, in United States funds or at Charterers'/Receivers' option, in local currency freely transferable to United States funds _____ 55

56

57

58

G BILLS
ADING

10.    Captain to call at Charterers', or their Agents' office as requested, and sign Bills of Lading as presented in the form customary for grain cargoes, 59
without prejudice to this Charter Party. If Bills of Lading are not ready for signature, the Captain is to deliver to Charterers, or their Agents at loading 60
port(s) a signed copy of his written authority to his agents at loading port(s) to sign Bills of Lading on his behalf *in strict accordance with Mate's Receipt.* In the event 61
Charterers require that bills
of lading show a rate of freight different from that indicated above, Charterers guarantee to pay Owners full freight in accordance with this contract, to be adjusted at the 62
time of final freight settlement *(See Clause 68)* 63

DORES AT

11.    Stevedores at loading port(s) employed *and paid by vessel to be approved by* Shippers/Charterers. , except if vessel is loaded at *Stowage to be under* 64
*Master's supervision.  Master to be responsible for the stability upon sailing.*

G PORT(S)

_____ then Charterers' Stevedores to be appointed at 65
(rates current at the loading berth(s).) (published tariff rate). In all cases Stevedores to be paid by the Owners and to remain their servants. 66

ME AT

12.    Vessel to be loaded according to Berth Terms in, *and spout trimmed, free of any risk, liability and expense to the vessel / Owners, at the average rate* 67
*of 8,000 metric tons per* weather working days of twenty-four

ING

consecutive hours each, *Friday 24:00 Hours ~ Sunday 24:00 Hours, Saturdays,* Sundays and Holidays excepted, *even if used. Any additional trimming to be* 68
*for Owners' account.* Laytime on Saturdays to be computed as follows:
a)  Notwithstanding any custom of the Port to the contrary, Saturday shall not count as laytime at loading and discharging port or ports where stevedoring labour and/or 69
grain handling facilities are unavailable on Saturday or available only at overtime and/or premium rates. 70
b)  In ports where only part of Saturday is affected by such conditions, as described under (a) above, laytime shall count until the expiration of the last straight time 71
period. 72
c)  Where six or more hours of work are performed at normal rates, Saturday shall count as a full day day. 73

/DISCHARGE

13.    a)    If vessel is delayed longer at loading port(s) than provided in clause 12 Charterers to pay Owners demurrage at the rate of *maximum U.S.$ 25,000.00 ~ to* 74

4

*be declared on vessel nomination (see Clause 45)*

per day or pro rata for part of a day provided such delay shall occur by fault of Charterers or their agents. If sooner despatched Owners to pay Charterers   75

despatch at *half the nominated demurrage rate* ............................................................ per day or pro rata for part of a day for all laytime saved. *Laytime non-reversible.*   76
Charterers to have the option to deduct *agreed* despatch *at load port* from payment of freight.   77
   b)   If vessel is delayed longer at the discharge port(s) or despatched sooner than provided in Clause 20, then Owners to collect demurrage or pay despatch as   78
per rates above.   79

14   *See Clause 44.*   Notification of the vessel's readiness to load and/or discharge at the first or sole loading or discharging port must be delivered at the office of   80
Charterers/Receivers or their Agents, at or before ~~4 P. M~~ *8 A.M* on any normal business day (or at or before 12 o'clock noon, if on Saturday, unless Saturday is a holiday).   81
Vessel   82
also having been entered at the Custom House, accompanied at loading port(s) by *local authorities:*   83
   ~~a)   In United States Ports:~~   84
   ~~i.    Certificate of readiness for all Cargo Compartments issued by the National Cargo Bureau, Inc.;~~   85
   ~~ii.   Certificate that all Cargo Compartments are free of insect infestation, and objectionable odours issued by a Grain Inspector holding a licence~~   86
       ~~issued by the U.S. Department of Agriculture pursuant to the U.S. Grain Standards Act, or other official body customarily issuing such~~   87
       ~~certificate;~~   88
   ~~b)   In Canadian ports:~~   89
   ~~i.    Certificate of Readiness for all Cargo Compartments issued by the Port Warden;~~   90
   ~~ii.   Certificate that all Cargo Compartments are free of insect infestation, and objectionable odours issued by a Grain Inspector employed by the~~   91
       ~~Canada Department of Agriculture or other official body customarily issuing such certificate(s) (and/or U.S. Grain Inspector if loading U.S.~~   92
       ~~grain in a Canadian port)~~   93
~~and also confirmation in Master's Notice of Readiness that Vessel's gear certificate as required by U.S. Department of Labour, or any similar authority,~~   94
~~where applicable, is in order.~~   95
~~and the laydays will then commence at 8 A.M. on the next business day, whether in berth or not.~~   96
~~   At second and subsequent ports of loading and/or discharge, if used, time to count at the beginning of the next regular working period after notification of vessel's~~   97
~~readiness to load or discharge has been delivered at the office of the Charterers/Receivers or their agents during ordinary business hours, vessel also having been~~   98
~~entered at the Custom House, whether in berth or not.~~

15   Time for loading, if required by Charterers, not to commence before 8 A.M. on *the opening layday.* ........................................ ~~19~~ .........................   99

*Lay/Can:*
*1st May 2013 / 31st May 2013, to be narrowed to a 10 day spread 40 days prior to the opening layday.*

*Cargo size to be declared by the Charterers 40 days prior to the opening layday.*

16   Should the Notice or Readiness at loading port not be delivered as per Clause ~~14~~ *44* by twelve o'clock noon on the .................................................   100

day of ...................................................................... ~~19~~......., the Charterers or their Agents shall at said hour and at any time thereafter, but not later than the   101
presentation of Notice of Readiness together with the required certificates *as per Clause 44 D* at said office, have the option of cancelling this Charter Party.   102
17.   a)   ~~At loading port(s) Charterers are entitled to up to three loading berths per port free of expense to Charterers. Charterers also have the liberty of additional~~   103
~~loading berths per port, and for berths used over three at each port, all shifting expenses including bunker fuel used to be for Charterers' account and all laytime used for~~   104
~~shifting to count.~~   105
   ~~b)   At each port of discharge Charterers/Receivers have the option of two or more discharging berths, all shifting expenses including bunker fuel used to be for~~   106
~~Charterers/Receivers account, and all laytime used for shifting to count.~~   107
   c)   Shifting/warping as ordered by the Elevator Authorities/Port Authorities/National Cargo Bureau/Port Warden for any purpose *is to be for the Charterers'*   108
*account and time used to count as laytime but is* not to be counted as addi-

tional loading/discharging berths 109

18.  Any securing (bagging or strapping, etc.) required by Master, National Cargo Bureau or Port Warden for safe trim/stowage to be supplied by and paid for by 110
Owners and time used not to count as laytime. 111

OUTTURN/CLD 19.  ~~If vessel is unable to enter Avonmouth or Hull or Glasgow immediately upon arrival owing to congestion, vessel shall be permitted to tender on arrival at~~ 112
SGOW ~~anchorage in Walton Bay or Spurn Head or Tail of the Bank, as applicable, and laytime to commence in accordance with clause 14. Time shifting from anchorage to~~ 113
~~discharge berth not to count as laytime.~~ 114

RGE TERMS 20.  Cargo to be discharged/received at the average rate of *(see Clause 44)* ................................................................................................... ~~tons per weather working~~ 115
~~day of 24 consecutive hours each, provided vessel can deliver at this rate, Sundays and Holidays excepted, Saturdays to be computed as per clause 42.~~ 116

*Discharging to be effected under Master's direction and supervision.* .......................................................................................................... 117

.................................................................................................................................................................................. 118

DORES AT 21.  Stevedores at discharge to be appointed by *and paid by Receivers* ....................................................... and paid by ............................................................ 119
RGE PORT(S) ~~If discharging in the United Kingdom including Northern Ireland, and if required by Charterers, vessel to discharge at Receivers' berth, provided same is~~ 120
~~accessible and available and workable on arrival, or time to count. When discharging at Receivers' wharf or berth if required, Receivers' stevedores to be employed at the~~ 121
~~current rate of the port at the time of commencement of discharge.~~ 122

RTHY TRIM 22.  ~~If ordered to discharge at two (2) or more ports, vessel is to be left in seaworthy trim to Master's satisfaction to proceed between ports.~~ 123

RTIME 23.  Overtime at loading and discharging ports shall be for account of the party ordering same, except overtime for vessel's officers and crew always to 124
be for Owners' account. 125

24.  ~~If required, master to give free use of vessel's winches and power to drive the gear, runners, ropes and slings as on board, and winchmen from the~~ 126
ES POWER ~~crew. If shore regulations do not permit the crew to work winches, then shore winchmen, if used, to be for Charterers' account at loading port(s) and Receivers' account~~ 127
GHTS ~~at discharging port(s). Master also to give free use of vessel's lighting as on board if required, for night work.~~ 128

AGE CLAUSE 25.  Should the vessel be ordered to discharge at a place at which there is not sufficient water for her to get the first tide after arrival without lightening, and lie 129
~~always afloat, lay days~~ are to count from 48 hours after her arrival at a safe anchorage for similar vessels bound for such place and any lighterage incurred 130
to enable her to reach the place of discharge is to be at the expense and risk of the *Charterers / Receiver of the cargo;* any custom of the port or place to the contrary 131
notwithstanding, 
but time occupied in proceeding from the anchorage to the port of discharge is not to count. 132

TS 26.  *Charterers'* ...... ........................ .......... Agents to be employed at loading port(s) and *Charterers'* ...... ........... ....... Agents to be employed at discharging port(s). 133

27.  At *loading and* discharging port(s), vessel to open hatches and remove beams, also to close hatches and replace beams all at vessel's time, risk and expense, 134
*providing local regulations permit, failing which same to be for Charterers' time / expense.*
Dismantling of shifting boards and/or bulking if any at discharging port(s) to be at Owners' time, risk and expense. 135

ERAGE 28.  A brokerage commission of *1.25* percent on gross freight, dead freight and demurrage is payable by Owners to *PASTERNAK, BAUM & CO. INC + 1.25% to* 136
*CLARKSONS* ............................................................................................................................................

QSSION

*and is deductible from freight.* ................................................ ....... ...................................................... 137

.................................................................................................................................................................................. 138
~~vessel lost or not lost, this contract performed or not performed, and all such commission shall be considered earned and due upon signing of this Charter Party. With~~ 139
~~Charterers' approval this brokerage commission may be deducted from the freight at time of payment, for remittance to broker(s).~~ 140

6

7

COMMISSION

29. An address commission of ................. 1.25 ................ % on gross freight, dead freight and demurrage is due to charterers on shipment of cargo, vessel lost or not lost, charterers having the right to deduct such commission from payment of freight.

LIEN CLAUSE

30. Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average.

CESSER CLAUSE

31. Charterers' liability under this Charter to cease on cargo being shipped, except *for payment of freight / deadfreight / demurrage save for any responsibility expressly stated or implied elsewhere in this Charter Party.*

ASSIGNMENT

32. Charterers, or their Agents, have the privilege of transferring/assigning all or part of this Charter to others, guaranteeing to the Owners the due fulfillment of this Charter.

GENERAL AVERAGE

33. General Average shall be payable according to the York/Antwerp Rules 1974 *as amended 1994* and be settled in London.

NEW JASON CLAUSE

34. ~~Where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." and the clause is shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.~~

ARBITRATION

35. **Arbitration in London (see Clause 65)** ~~Any dispute between Owners and Charterers arising out of this Charter shall be submitted at New York in the following manner:~~

NEW YORK [if applicable]

36. ~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men.~~

ARBITRATION LONDON [if applicable]

36. All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be Members of the Baltic and engaged in the Shipping and/or Grain Trades, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. Any claim must be made in writing and Claimants' Arbitrator appointed within three months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his acting be taken before the award is made.

37. It is also mutually agreed that the Carrier shall not be liable for loss or damage occasioned by causes beyond its control, by the perils of the seas or other waters, by fire from any cause, whatsoever occurring, by barratry of the master or crew, by enemies, pirates or robbers, by arrests and restraint of Princes, rulers or people, by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances, by collisions, stranding or other accidents of navigation of whatsoever kind (even when occasioned by the negligence, default or error in judgment, of the pilot, master, mariners or other servants of the ship owner, not resulting, however, in any case, from want of due diligence by the owners of the ship or any of them, or by the Ship's Husband or Manager).

GENERAL CLAUSE

38. (1) *POSITIVE 1993 to apply.* No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed or if the port to which the ship has been ordered to discharge either on signing Bills of Lading, or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any Government or the owner shall discharge the cargo at any other port advised by this Charter party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and be entitled to freight as if the ship had discharged it the port or ports of discharge to which she was originally ordered.

(2) The ship shall have liberty to comply with any orders or directions as to departure arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or by any other Government or...

141
142

143

144

145
146

147
148
149
150
151
152
153
154
155
156
157

158
159
160
161
162
163
164
165

166
167
168
169
170
171
172

173
174
175
176
177
178

~~any department thereof or any person acting or purporting to act with the authority of such Government, or of any department thereof or by any committee or person~~ 179
~~having under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders~~ 180
~~or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment~~ 181
~~of the contract voyage and the freight shall be payable accordingly.~~ 182

39.  If the cargo cannot be loaded by reason of riots, civil commotions or of a strike or lock-out of any class of workmen essential to the loading of the cargo, 183
or by reason of obstructions or stoppages beyond the control of the Charterers caused by riots, civil commotions or a strike or lock-out on the railways, 184
or in the docks, or other loading places, or if the cargo cannot be discharged by reason of riots, civil commotions, or of a strike or lock-out of any class of workmen 185
essential to the discharge, the time for loading and/or discharging, as the case may be, shall not count during the continuance of such causes, provided that a strike or 186
lock-out of the Shippers' and/or Receivers' men shall not prevent demurrage from accruing if by the use of reasonable diligence they could have obtained 187
other suitable labour at rates current before the strike or lock-out. In case of any delay by reason of the beforementioned causes, no claim for damages 188
or demurrage shall be made by the Charterers/Receivers of the cargo, or Owners of the ship. For the purpose, however, of settling despatch accounts, any time lost by 189
the ship through any of the above causes at loading port(s) shall be counted only as time used in loading, and, if occurring at discharging port(s) only to be counted as 190
time used in discharging. 191

40.  The ship shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering 192
at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of 193
loading or discharge named in this Charter Party and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and 194
deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage. 195

41.  If the liability for any collision in which the ship is involved while performing this Charter Party falls to be determined in accordance with the laws of the United 196
States of America, the following clause shall apply: 197
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the 198
servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability 199
to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners 200
of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered 201
by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. 202
The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding 203
ships or objects are at fault in respect to a collision or contact." 204
and the charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause. 205

42.  *Clause 42 and 43 are to be either deleted or to remain as printed, contingent on where the vessel loads be it, the United States, Canada or South* 206
*America.*  It is also mutually agreed that this contract shall be completed and superseded by the signing of Bills of Lading which shall be deemed to incorporate the above 207
clauses as well as containing the following additional clause/(s): 207
"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be 208
deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its 209
responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that 210
extent but no further." 211
"This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods 212
Act, 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a 213
surrender by the carrier of any of its rights or immunities, or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading 214
be repugnant to said Act to any extent, such terms shall be void to that extent, but no further." 215

*Clauses 43 to 69, both inclusive, to be fully incorporated in this Charter Party.*



9

WORKING
COPY

This Charter Party is a computer generated copy of the BALTIMORE FORM C BERTH GRAIN CHARTER PARTY* (Adapted 1953) form printed using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original approved document shall apply. STRATEGIC SOFTWARE LTD. assume no responsibility for any loss or damage caused as a result of any discrepancies between the original approved document and this document.



<u>RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN".</u>
<u>CHARTER PARTY DATED OSLO: 8TH MARCH 2013</u>

<u>Clause 43:</u>

Cargo to be discharged free of expenses to the vessel at the rate of 8,000 metric tons (eight thousand) per weather working day of twenty four (24) consecutive hours, Saturdays, Sundays and Holidays excluded even if used.  Time from 00:01 Hours Saturday, or 24:00 Hours on day prior Holiday, until 24:00 Hours Sunday, or 00:01 Hours on day after holiday, not to count, even if used.

<u>Clause 44 – Notice of Readiness and Commencement of Laytime:</u>

a)   *Load Port:*

Notice of vessel's readiness to load at the first or sole loading port shall be delivered in writing at the office of Charterers / Receivers or their agents between the hours of 08:00 Hours to 16:00 Hours on all days except Sundays and Holidays and between the hours of 08:00 Hours to 12:00 Hours on Saturdays.  Charterers shall not be required to accept Notice of Readiness to load on Saturdays after 12:00 Hours or on Sundays or Holidays.  Such Notice of Readiness shall be delivered when vessel is in the loading berth and is in all respects ready to load, including free pratique where applicable.  If the loading berth is unavailable, Master may tender vessel's Notice of Readiness from a lay berth or anchorage within the commercial limits of the port whether in port, berth, free pratique or Customs cleared or not subject to the provisions of Clause 44 paragraph C.

Following receipt of Notice of Readiness to load as above, laytime will commence at 08:00 Hours on the next working day, Saturdays, Sundays and Holidays excepted per agreed terms.

b)   *Discharge Port:*

Notice of vessel's readiness to discharge must be delivered at the office of Receivers or their agents between the hours of 08:00 to 17:00 Hours Monday to Friday and between 08:00 – 12:00 Hours Saturday after vessel's entrance into berth, vessel also having been entered at the Customs house, after granting free pratique and time will commence at first or sole port of discharge at 08:00 Hours on the next working day.

In case the berth is occupied by other vessel(s) and docking is preventing for this reason, notification of vessel's readiness to discharge must be delivered at the office of Receivers between the hours of 08:00 to 17:00 Hours Monday to Friday, vessel having been entered at the Custom House, after granting free pratique and the laytime shall then commence at 08:00 Hours on the next business day whether in berth or not, whether in port, berth, free pratique or Customs cleared or not, but any prior time used not to count as laytime.  In the event that it is impossible to obtain customs clearance / free pratique from anchorage then time to count after arrival as per Charter Party.

Actual time occupied in moving from place of waiting to discharge not to count as laytime, unless vessel is already on demurrage.  If after berthing the vessel is found not to be ready in all respects to discharge, the actual time lost from the discovery thereof until she is in fact ready to discharge shall not count as laytime.

Time used prior commencement of laytime not to count both ends.

Shifting time from pilot station or anchorage to 1st berth not to count as laytime.

1

RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN"
CHARTER PARTY DATED OSLO: 8TH MARCH 2013

Laytime to cease after 17:00 Hours before a local, legal or public holiday and resume at 08:00 Hours on the day following a local, legal or public holiday.

c)   *Waiting for Berth:*

If the vessel is prevented from entering the commercial limits of the loading / discharging ports because the first or sole loading / discharging berth or a lay berth or anchorage is not available, or on the order of the Charterers or any competent official body or authority and the Master warrants that the vessel is physically ready in all respects to load or discharge, the time spent waiting at a usual waiting place outside the commercial limits of the port or off the port shall count against laytime. Such laytime shall count from vessel's arrival at such waiting place and will continue to run as per Charter Party terms until any of the aforesaid conditions cease to be operative and vessel is so notified by Charterers or their agents or any competent authority. If after entering the commercial limits of the loading port, vessel fails to pass inspections as per Clause 44 d), such inspections from the time of initial failure to pass not to count as laytime, but the time spent waiting outside the commercial limits of the port shall count. Shifting time from layberth / anchorage to load berth not to count as laytime.

Once the vessel has reached a place within the commercial limits of the port, Notice of Readiness is to be tendered in accordance with the provisions of the first paragraph of 44 a) above and laytime is to begin to count in accordance with second paragraph of 44 a) above.

d)   *Inspection:*

At the loading port Master's Notice of Readiness shall be accompanied by a Pass of the NCB and USDA (or local Grain Inspector depending which country the vessel loads) Grain Inspector's Certificate of vessel's readiness in all compartments to be loaded, for the entire cargo covered by this Charter Party as per Clause 1.

Notice of Readiness for discharge to be accepted also if tendered between 08:00 Hours and 12:00 Hours Saturdays.

**Clause 45 – Demurrage / Despatch:**

Demurrage / despatch to be declared by Owners together with vessel nomination (see Clause 56), but same to be maximum U.S.$.25,000.00 (Twenty Five Thousand Dollars United States Currency) per day or pro-rata for part of a day, for all time used in excess of allowed laytime, provided such detention shall not have occurred by default of Owners / Master or their agents. Actual demurrage rate to be in Owners' option and declarable on nomination of the performing vessel 12 (twelve) days prior to vessels ETA. It is understood that the demurrage rate declared by Owners will be the same at both load and discharge. If sooner dispatched, Charterers to collect from Owners despatch money at the rate of one half of the demurrage rate per day or pro rata for part of a day for all laytime saved.

Laytime is non-reversible.

Agreed demurrage / despatch, if any, to be paid within 30 (thirty) days after completion of discharge.

**Clause 46:**

All freight rates are basis free in and out, spout trimmed only. Any additional trimming required to be for Owners' time, risk and expense.

2



## RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN"
## CHARTER PARTY DATED OSLO: 8TH MARCH 2013

**Clause 47:**

Vessel will furnish lights as may be available on board, during day and night at Owners' expense if required by Charterers or Receivers. Vessel / Master to give free use of vessel's power to drive the running, ropes and slings on board.

**Clause 48:**

If fumigation at discharging port is necessary, time used to count as laytime or time on demurrage. Cost of fumigation and/or all expenses including transportation / accommodation / meals for Officers / crew to go on shore for Charterers' account.

**Clause 49:**

The vessel is to be fully covered for the duration of this Charter by a P. & I. Club which is to be a member of the International Association of P. & I. Clubs.

**Clause 50:**

Owners to supply certification evidence that vessel Classified 100 A1 according to Lloyd's Register or equivalent and in this last case the certificates will have to stipulate that the classification mentioned corresponds to 100 A1 under the Lloyd's Register. The vessel's Classification Society to be a full member of the IACS.

**Clause 51:**

Sailing notice and estimated time of arrival:

1.  Upon completion of loading Owners shall give a sailing notice by telex to Receiver at country of destination (telex number / cable address to be advised at time of declaring discharge area).

    Such sailing notice shall indicate vessel's name, port of loading, commodity and quantity loaded, vessel's draft and length overall, time of sailing and estimated time of arrival at discharging port, also 7 / 5 / 3 / 2 / 1 day(s) of vessel's ETA.

2.  Discharge port is to be named by Charterers soonest known but latest passing SINGAPORE.

3.  Four (4) days prior to vessel's estimated time of arrival at the discharging end, the Master to telex the Charterers / Receivers, the following information:

    1.  Radio call letters

    2.  Estimated time of arrival at discharging port

    Master to cable Charterers' / Receivers' designated address, to be advised together with vessel's agents, vessel's most precise ETA as per Clause No. 3.

**Clause 52:**

Master to inform discharge port agents or their representatives of any problem which might arise during discharge operations and to copy of all telexes, faxes and letters they send covering unloading and laytime calculations.

3

**RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN"**
**CHARTER PARTY DATED OSLO: 8TH MARCH 2013**

**Clause 53:**

Owners warrant that vessel is approved by their own Classification Society or an organisation acceptable thereto for the carriage of bulk grain under the applicable SOLAS Regulations and Owners further warrant that approved information relating to disposition from trimming ends of filled holds will be on board on arrival at loading port, any trimming required over the above the agreed spout trimming to be for Owners' account and time so used not to count as laytime (or time on demurrage).

**Clause 54:**

All opening and closing of hatches at discharging port to be for Owners' account, provided permitted by local regulations.

**Clause 55:**

In accordance with local regulations Owners to remit funds to cover ships disbursements before arrival at destination. Owners hereby undertake to remit such funds to their agents in due time.

**Clause 56 ~ Nomination Clause:**

**M.V. "INTERGIS CO. LTD TBN"**

Vessel to be nominated 12 days prior to ETA load port. Upon vessel nomination advise full chain up to including Head Owner.

Vessel to be a single deck, geared or gearless, self-trimming, bulk carrier

Vessel to be maximum 20 years in age, Additional Premium to be for Owners' account. 15 years and older in accordance to Lloyds Scale.

Vessel to be suitable in all respects for the loading, carriage and discharge of bulk HSS from South America to China.

Vessel to be classed Lloyds 100+A1 or equivalent.

Vessel to be fully covered for the duration of this Charter by P. & I. Club which to be a member of the international Association of P. & I. Clubs.

**Clause 57:**

Owners shall comply with any and all federal, state, provincial or local regulations to financial responsibility for water pollution.

Any time lost on account of vessel's non-compliance with federal, state, provincial or local statutory or regulatory requirements pertaining to water pollution shall not count as laytime or time on demurrage and Owners shall indemnify Charterers for any penalties or damages incurred by Charterers as a result of Owners' non-compliance with such statutory or regulatory requirements.

4

**RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN"**
**CHARTER PARTY DATED OSLO: 8TH MARCH 2013**

**Clause 58:**

All discharge expenses including unstowage and lighterage / lightening, if any, to be for Charterers' / Receivers' risk and expense.  Time used for lighterage / lightening to count as laytime provided vessel has arrived with draft not exceeding 12.2 meters salt water.

**Clause 59 – Sanction Clause:**

Owners warrant that no vessel covered by this Charter Party or Contract of Affreightment is registered, owned or controlled by the Government of Cuba, Iraq, Iran or North Korea.

**Clause 60 – Asian Gypsy Moth Clause:**

Owners to warrant that vessel has not called at any Commonwealth of Independent State Far East ports including but not limited to Nakhodkha, Vladivostock and Vostochny in last two years.

Prior to tendering vessel's Notice of Readiness vessel to be in compliance with local regulations to load contracted cargo.

**Clause 61 – Fumigation:**

Charterers have the right to fumigate vessel's holds, compartments, hatchways and cargo while on board.  Cost, risk and time of such fumigation to be for Charterers' account and time to count as laytime.

All costs associated with removal of fumigation sleeves to be for Owners' account.

**Clause 62:**

Any trimming required by Master / Owners in excess of spout trimming is to be at Owners' time, risk and expense and time so used is not to count as laytime or time on demurrage.

**Clause 63:**

Vessel shall provide adequate lighting as on board for night work in the holds.  Vessel shall supply drinking water to stevedores at discharge free of charge.

**Clause 64:**

Charterers or their agents shall have the right of being on board the vessel while loading or discharging for the purpose of supervising their interests, subject to Owners' / Head Owners' approval.

**Clause 65 – Arbitration:**

Notwithstanding anything to the contrary in this Charter Party, the parties agree that all arbitration where the amount in issue in the dispute(s) is less than U.S.$ 50,000.00 shall be conducted according to the Small Claims Procedure 1994 (SCP) of the London Maritime Arbitrators Association (as amended from time to time).

5

RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN"
CHARTER PARTY DATED OSLO: 8TH MARCH 2013

Any disputes arising under this Charter to be referred to arbitration in London in accordance with
LMAA Terms, with English Law to apply. One arbitrator to be nominated by Owners and the other
by Charterers. In case the two arbitrators shall not agree, then an umpire to be appointed by them.
The award of the arbitrators or the Umpire to be final and binding upon both parties. If either of the
appointed arbitrators refuses to act or is incapable of acting or dies, the party who appointed him may
appoint a new arbitrator in his place. If one party fails to appoint an arbitrator either originally or by
way of substitution as aforesaid in seven clear days after the other party having appointed his
arbitrator, has served the party making default with notice to make the appointment, the party who
appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his
award shall be binding on both parties as if he had been appointed by consent.  Arbitrators to be
commercial shipping men.

Any claim must be made in writing and claimants' Arbitrator to be appointed within twelve (12)
months of final discharge or termination of this Charter Party whichever the case may be, and where
this provision is not complied with the claim shall be deemed to be waived and absolutely barred.  No
award be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above,
unless objection to his / her acting be taken within seven (7) days of the appointment being made).

Clause 66:

100% (one hundred per cent) freight is payable on signing / releasing Bill(s) of Lading.

Owners undertake to release *"Freight pre-paid"* Bill(s) of Lading if/as required by Charterers
immediately upon receipt of 100% freight into Owners' nominated bank account.

Balance for freight with demurrage / despatch, if any, to be settled within 30 days after completion of
discharging.

Clean Mate's Receipts to be signed for each parcel of cargo when on board and Master to sign Bill(s)
of Lading in accordance therewith as requested  by Charterers / Shippers or their agents. Master to
reject any cargo which would involve the clausing of Mate's Receipts and/or Bill(s) of Lading but
Charterers to remain fully responsible for the discharge / removal and disposal of said cargo as well as
the replacement of the same with sound cargo.  Charterers' option to accept "claused" cargo, but
relevant Bill(s) of Lading to be claused accordingly.  Owners' P. & I. Club and Charterers will work
together to find a suitable solution should "claused" Bill(s) of adding become problematical.

At discharge port, in absence of original Bill(s) of Lading, Owners / vessel to discharge and release
cargo against Charterers' single Letter of Indemnity in Owners' P. & I. Club wording signed by
Charterers' only.

Clause 67 – Stevedore Damage Clause:

Any Stevedore damage to the vessel to be reported by the Master to the party causing same as soon as
any damages have been discovered but not later than vessel's sailing from the port where damage
occurred.  Such damages to be repaired prior vessel's departure by party causing same and Charterers
to assist Owners, but not to be held responsible.

Clause 68:

All taxes / dues on cargo to be for Charterers' account.

All taxes / dues on vessel / freight to be for Owners' account



## RIDER CLAUSES TO M.V. "INTERGIS CO. LTD TBN"
## CHARTER PARTY DATED OSLO: 8TH MARCH 2013

<u>Clause 69:</u>

This fixture to be kept absolutely private and confidential.

WORKING
COPY

7

# EXHIBIT C

## PASTERNAK, BAUM & CO., INC.

500 MAMARONECK AVENUE, HARRISON, NY 10528

TELEPHONE
(914) 630-8000
FAX
(914) 630-8120

Contract Number:  108448
Contract Date:    01/23/2014

SELLER:       BTG Pactual Commodities (Singapore)Pte.Ltd.
              One Marina Boulevard #28-00
              Singapore 018989

BUYER:        Marubeni America Corporation
              375 Lexington Avenue
              New York, NY 10017-5644

GOODS: BRAZILIAN SOYABEANS, SPECIFICATIONS AS PER ANEC CTR. 41
CLAUSE 2: BASIS 18,5% OIL CONTENT, MINIMUM 18,0% WITH
NON-RECIPROCAL ALLOWANCE OF 1,5% FOR EACH 1% FRACTION IN
PROPORTION, IN BUYERS FAVOR FOR ANY DEFICIENCY; MOISTURE MAX. 14 %,
FOREIGN MATERIALS BASIS 1% MAX. 2%, WITH NON-RECIPROCAL ALLOWANCE
OF 1% FOR EACH 1% DEFICIENCY FRACTIONS IN PROPORTION. SPLITS: 20.0%
BASIS, 25% MAXIMUM. IF SPLITS IS BETWEEN 20,01% UP TO 25,00%
MAXIMUM, THE SELLER SHALL PAY TO THE BUYER AN ALLOWANCE OF 1% OF
THE CONTRACT PRICE FOR EACH 1% EXCESS (1:1), FRACTIONS IN
PROPORTION. SPLITS 20,00% OR LESS FREE TO BUYERS. ALL OTHER AND
QUALITY CONDITIONS AS PER ANEC 41 CLAUSE 2.

QUANTITY: 60.000 METRIC TONS WITH 10 (TEN) PERCENT MORE OR LESS AT
VESSEL'S OPTION AND AT CONTRACT PREMIUM. IN BULK.

DELIVERY PERIOD: BETWEEN JULY 15 AND AUGUST 15, 2014, BOTH DATES
INCLUDED.

PRE-ADVICE: 12 DAYS.

PRICE: FREE ON BOARD, STOWED/TRIMMED ON ONE SELF-TRIMMING BULK
CARRIER (WING/DEEP TANKS EXCLUDED) ON ONE SAFE BERTH AT ONE SAFE
PORT TO BE DECLARED AT SELLER'S OPTION LATEST JUNHO 15, 2014,
BETWEEN FOLLOWING PORT OPTIONS, BEING:
OPTION 1 - SANTOS/SP PORT, BRAZIL, IN A BERTH WITH MINIMUM 13
METERS DRAFT OR APPROACHED THERE TO:
AT USD 0,72 PER BUSHEL OVER CBOT JULY/2014.

OPTION 2 - SÃO FRANCISCO DO SUL/SC PORT, BRAZIL:
AT USD 0,72 PER BUSHEL OVER CBOT JULY/2014.

OPTION 3 - RIO GRANDE/RS PORT, BRAZIL, IN A BERTH WITH MINIMUM 42
FEET DRAFT: AT USD 0,72 PER BUSHEL OVER CBOT JULY/2014.

OPTION 4 - TUBARÃO/ES PORT, BRAZIL:
AT USD 0,69 PER BUSHEL OVER CBOT JULY/2014.

FUTURES IN EXCHANGE, BUYER'S GIVE UP - PRICING TO BE PERFORMED AS

PER ANEC 41, CLAUSE 5.2.B AND 5.2.C.

CONVERTION RATE: 36.7433

WEIGHT/QUALITY: FINAL AT PORT OF LOADING AS PER CERTIFICATE ISSUED
BY INDEPENDENT SURVEYOR, MEMBER OF BRAZILIAN ASSOCIATION OF
SURVEYING COMPANIES, ASCB (ASSOCIAÇÃO DAS SUPERVISORAS E
CONTROLADORAS DO BRASIL)
TO BE CHOSEN BY BUYER BETWEEN INSPECTORATE, BALTIC, ALEX STEWART,
INTERTEK, SCHUTTER AND SUPERISPECT, AT SELLER'S ACCOUNT.

PAYMENT: CASH 48 HOURS AFTER RECEIPT OF COPIES OF THE FOLLOWING
DOCUMENTS BY E-MAIL:
(SELLERS TO SEND ORIGINAL DOCUMENTS TO BUYERS BY
 COURIER RIGHT AFTER PAYMENT CONFIRMATION)

1. SIGNED COMMERCIAL INVOICE.
2. FULL SET OF 'CLEAN ON BOARD' BILLS OF LADING MARKED
   'FREIGHT PREPAID' AND MADE OUT TO ORDER AND BLANK
   ENDORSED.
3. CERTIFICATE OF ORIGIN ISSUED BY A GOVERNMENT ENTITY.
4. CERTIFICATE OF WEIGHT ISSUED BY INDEPENDENT SURVEYOR
   AT BUYER'S OPTION BETWEEN INSPECTORATE, BALTIC, ALEX
   STEWART, INTERTEK, SCHUTTER AND SUPERISPECT AT
   SELLER'S ACCOUNT.
5. CERTIFICATE OF QUALITY ISSUED BY INDEPENDENT SURVEYOR
   AT BUYER'S OPTION BETWEEN INSPECTORATE, BALTIC, ALEX
   STEWART, INTERTEK, SCHUTTER AND SUPERISPECT AT
   SELLER'S ACCOUNT.
6. FUMIGATION CERTIFICATE ISSUED BY INDEPENDENT SURVEYOR
   OR FUMIGATION COMPANY AT SELLER'S OPTION AT FINAL
   LOADPORT.
7. SHIP'S HOLD INSPECTION CERTIFICATE ISSUED BY
   INDEPENDENT SURVEYOR AT BUYER'S OPTION BETWEEN
   INSPECTORATE, BALTIC, ALEX STEWART, INTERTEK,
   SCHUTTER AND SUPERISPECT AT SELLER'S ACCOUNT.
8. PHYTOSANITARY CERTIFICATE WITH STANDARD FORMAT ISSUED
   BY GOVERNMENT AUTHORITY.
9. LABORATORY CERTIFICATE ISSUED BY INDEPENDENT SURVEYOR
   AT BUYER'S OPTION BETWEEN INSPECTORATE, BALTIC, ALEX
   STEWART, INTERTEK, SCHUTTER AND SUPERISPECT AT
   SELLER'S ACCOUNT CERTIFYING THAT THE SOYBEANS ARE
   SUBSTANTIALLY FREE FROM THE FOLLOWING DISEASES,
   PESTS, AND WEEDS DANGEROUS TO PLANTS IN ACCORDANCE
   WITH THE REGULATIONS OF THE MINISTRY OF AGRICULTURE
   OF THE PEOPLE'S REPUBLIC OF CHINA.

1. ARABIS MOSAIC VIRUS
2. CALLOSOBRUCHUS ANALIS (FABRICIUS)
3. CALLOSOBRUCHUS PHASEOLI (GYLLENHALL)
4. CUSCUTA SPP
5. PHYTOPHTHORA MEGASPERMA DRECHSL F. SP GLYCINEA KUAN &

ERWIN
6. SORGHUM ALMUM PARODI
7. SORGHUM HALEPENSE (L.) PERS
8. SOUTHERN BEAN MOSAIC VIRUS
9. TOBACCO RINGSPOT VIRUS
10. TOMATO RINGSPOT VIRUS

THE SOYBEANS SUPPLIED ARE SUBSTANTIALLY FREE FROM CASTOR
SEEDS/HUSKS, FOREIGN POISONOUS SEED, UREA AND/OR CHEMICAL
SUBSTANCES THAT ARE NOT A NATURAL PART OF SOYBEANS AND/OR OF FAIR
MERCHANTABLE QUALITY.
THE SOYBEANS SUPPLIED ARE IN GOOD CONDITION, FIT FOR HUMAN EDIBLE
PURPOSE, WITHOUT ANY UNPLEASANT ODOR, FREE FROM ANY SIGN OF MOLD,
FERMENTATION OR DETERIORATION AS WELL AS FREE FROM EVIDENCE OF
PLANT INJURIOUS DISEASES.

10. CERTIFICATE OF CHEMICAL RESIDUES ISSUED BY
    INDEPENDENT SURVEYOR AT BUYER'S OPTION BETWEEN
    INSPECTORATE, BALTIC, ALEX STEWART, INTERTEK,
    SCHUTTER AND SUPERISPECT AT SELLER'S ACCOUNT
    CERTIFYING THAT THE CHEMICAL RESIDUES OF THE
    SOYBEANS SUPPLIED BY THE SELLER SHOULD NOT EXCEED
    THE REGULATIONS STIPULATED BY THE MINISTRY OF PUBLIC
    HEALTH OF THE PEOPLE'S REPUBLIC OF CHINA AND
    SUBSTANTIATED BY A QUALIFIED INDEPENDENT LABORATORY
    AT LOADING:
1.  ARSENIC COMPOUND SHALL BE MAXIMUM OF 1 PPM (1 PART
    PER MILLION CALCULATED ACCORDING TO THE ARSENIOUS
    OXIDE (AS2O3) CONTENT).
2.  PHOSPHIDES SHALL BE MAXIMUM OF 0.05PPM (0.05 PARTS
    PER MILLION CALCULATED ACCORDING TO THE PH3
    CONTENT).
3.  CYANIDES SHALL BE MAXIMUM OF 5PPM (5 PARTS PER
    MILLION CALCULATED ACCORDING TO THE HCN CONTENT).
4.  MALATHION SHALL BE MAXIMUM OF 3PPM (3 PARTS PER
    MILLION).
5.  MERCURIC COMPOUND SHALL NOT BE FOUND.
6.  ETHYLENE DEBROMIDE (EDB) CONTENT SHALL NOT EXCEED
    10PPB (10 PARTS PER BILLION).

SPECIAL CLAUSE:
-NOTHING IN THIS CONTRACT SHALL OBLIGE A PARTY TO
 PERFORM ANY OBLIGATION IF SUCH PERFORMANCE WOULD BE IN
 CONTRAVENTION OF OR INCONSISTENT WITH ANY LAWS,
 REGULATIONS, STATUTES OR PROHIBITIONS IMPOSED BY THE
 UNITED STATES OF AMERICA, OR THE UNITED NATIONS, OR
 THE EUROPEAN UNION, OR THE UNITED KINGDOM, OR CANADA
 OR ANY OTHER COUNTRY APPLICABLE TO THE PARTIES
 RELATING TO THE ADOPTION, IMPLEMENTATION AND
 ENFORCEMENT OF ECONOMIC SANCTIONS, EXPORT CONTROLS,
 TRADE EMBARGOES OR OTHER RESTRICTIVE MEASURES
 INCLUDING BUT NOT LIMITED TO THOSE MEASURES WHICH

PROHIBIT OR OTHERWISE RESTRICT EITHER PARTY'S ABILITY
TO IMPORT OR EXPORT PRODUCT, OR SUPPLY PRODUCT OR
SERVICES, DIRECTLY OR INDIRECTLY ("SANCTIONS") TO ANY
COUNTRY (OR NATIONAL OR GOVERNMENT THEREOF), STATE,
TERRITORY, REGION, INCORPORATED ENTITY, NATURAL OR
OTHER LEGAL PERSON (OR ANY ENTITY WHICH IS
MAJORITY-OWNED OR CONTROLLED BY OR ACTING ON BEHALF OF
SUCH A PERSON) ("SANCTIONED ENTITY").
-FOR THE AVOIDANCE OF DOUBT, NEITHER PARTY SHALL BE
REQUIRED TO ACCEPT A NOMINATION OF OR SHIP OR ACCEPT A
CARGO ON BOARD A VESSEL THAT IS A, OR THAT IS OWNED,
CHARTERED, MANAGED OR CONTROLLED, DIRECTLY OR
INDIRECTLY BY ANY, SANCTIONED ENTITY.

THE BUYER AND SELLER WARRANT COMPLIANCE WITH SANCTIONS IN ALL
RESPECTS RELATED DIRECTLY OR INDIRECTLY TO THE PERFORMANCE OF THIS
CONTRACT.

-THE BUYER SHALL NOT RESELL OR TRANSPORT THE COMMODITY
TO ANY SANCTIONED ENTITY, OR TRANSPORT THE COMMODITY
ON ANY VESSEL OR OTHER CARRIER OWNED, FLAGGED OR
CHARTERED BY, ANY SANCTIONED ENTITY.

OTHER CONDITIONS:
-THE VALIDITY OF THIS CONTRACT SHALL NOT BE AFFECTED BY
NON-RETURN OF A SIGNED COPY.
-ANY EXTRA CHARGES APPLIED FOR LOADING SINGLE/TWEEN
DECKERS, WING AND/OR DEEP TANKS TO BE FOR BUYERS
ACCOUNT.
-CARRYING CHARGES: AS PER ANEC 41, CLAUSE 10.
-NO CARRING CHARGES TO APPLY IF VESSEL TENDER
CORRESPONDING NOTICE OF READNESS (NOR) AT LOADING PORT
UNTIL 17:00 HS DURING ORDINARY OFFICE HOURS UP TO AND
INCLUDING THE LAST DAY OF SHIPMENT PERIOD.
-LOADING RATE: 8.000 MT PER WWDSATPMSHEX EVEN IF USED.
WIPON/WIBON/WIFPON. AS PER ANEC 9.2.
-DEMURRAGE/DESPATCH RATE: AS PER C/P TO BE DECLARED
UPON CHARTERING OF THE VESSEL. DEMURRAGE NOT TO EXCEED
USD 30.000,00 AND HALF DESPATCH. DESPATCH ON WORKING
TIME SAVED.
-FUMIGATION TO BE SUPPLIED BY SELLERS AND TIME TO COUNT
AS LAYTIME. (EXCEPT IN CASE FUMIGATION STOPS OR IS
DELAYED DUE TO REASONS BEYOND SELLER'S REPONSABILITY -
IN THIS CASE TIME LOST NOT TO COUNT AS LAYTIME).
-INFRAMAR/TUP TAX (PORT UTILIZATION TAX) FOR SELLER'S
ACCOUNT.
-ARBITRATION AS PER CLAUSE 16.A OF ANEC CTR 41.
-ALL OTHER TERMS AND CONDITIONS NOT IN CONTRADICTION
WITH THE ABOVE TO BE AS PER ANEC CTR 41 IN FORCE AT
TIME AND PLACE OF SHIPMENT.

Page 5

Marubeni America Corporation          BTG Pactual Commodities (Singapore)Pte.Ltd.
(Buyer)                               (Seller)

By: _____        By: _____
    (Signature)                           (Signature)

Pasternak, Baum & Co., Inc.
By: _____
    (As Brokers Only)

92

# EXHIBIT D

## <u>SALE AND PURCHASE AGREEMENT</u>

This Agreement made and entered into this 2nd day of April, 2015 by and between Marubeni Corporation, a corporation duly organized and existing under the laws of Japan, with its principal office at 4-2, Ohtemachi 1-chome, Chiyoda-ku, Tokyo, Japan (hereinafter called the "Seller") and CRC Cargo Recovery Consultants S.A. of 6 rue Neuve, 1260 Nyon, Switzerland (hereinafter called the "Buyer"),

### Witnesseth:

Whereas, the Seller is engaged in the business, among other things, of selling Brazilian soybeans loaded on board MV ADAMASTOS at Rio Grande Port in August 2014 and believed to be 59,675mts and made an integral part hereof (hereinafter called the "Cargo"), originally supplied by Bunge Limited, a corporation duly organized and existing under the laws of the state of U.S.A., with its principal office at 50 Main Street White Plains, New York, New York, U.S.A. (hereinafter called "Bunge"), and now owned by the Seller and desires to sell the same to the Buyer;

Whereas, the Cargo, is subject to Brazilian court actions, is laden on board the Ship named "Adamastos," which is now arrested by Brazilian Government in the seaport of Rio Grande and the object of the auction procedure in Brazilian Court initiated on 11th March, 2015; and

Whereas, the Cargo is insured for all risk of loss of or damage by Sompo Japan Nipponkoa Insurance Inc., a corporation duly organized and existing under the laws of Japan, with its principal office at 26-1, Nishi-Shinjuku 1-chome, Shinjuku-ku, Tokyo, Japan (hereinafter called the "underwriter").

Whereas, the Buyer desires to purchase the Cargo from the Seller on the terms and conditions hereinafter set forth.

Now, therefore, in consideration of the foregoing premises and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:



- 1 -



### Article 1.  Sale and Purchase

1.1.   The Seller agrees to sell and deliver and the Buyer agrees to purchase, take delivery of and pay for the Cargo on the terms and conditions and at the price hereinafter set forth.

### Article 2.  Price

2.1.   The price of the Cargo shall be the lump sum price of US$ 3.35 million subject to the other terms set out herein. Any levy or duties that may be applied by relevant authority, including sales tax or other tax relating to any prior sales and purchase transactions shall be for the account of the Seller. Any sales tax or other tax relating to the sale of the cargo which is the subject of this Agreement shall be borne by the Buyer.

### Article 3.  Payment Terms

3.1.   All sums due from the Buyer to the Seller for the Cargo sold hereunder (hereinafter called the "Funds") shall be paid into client account of K&L Gates, LLP as security for the Buyer's performance of this Agreement. Such payment shall be made by wire transfer no later than five (5) days prior to the estimated departure date of the vessel and tow from Rio Grande, Brazil, and the payment will be released to the Seller by K&L Gates, LLP upon receipt of the confirmation from the Lloyd's Agent set forth in Article 3.2, below.

3.2.   The Funds will be retained by K&L Gates, LLP until the Vessel has departed from Brazilian territorial waters. For the avoidance of the doubt, the Seller shall not be entitled to the Funds until confirmation from Lloyd's Agent at Rio Grande that the Vessel has departed from Brazilian territorial waters.

3.3.   In the event for whatever reason, the Vessel has not departed from Brazilian territorial waters by 25 April 2015 then the Funds held by K&L Gates LLP shall be returned to the Buyer or subject to agreement by the parties, shall be held as security for further period of 30 days, or as thereafter may be extended by the parties, for the Vessel to depart from Brazilian territorial waters.





- 2 -

## Article 4.  Terms of Delivery and Title to the Products

4.1.    The Buyer shall receive the Cargo in present condition on "as-is, where is" basis unless otherwise agreed between the parties hereto.

4.2.    On receipt of the Funds by K&L Gates, LLP under Article 3.1 above title to the Cargo shall pass to the Buyer. In the event that the Vessel has not left the territorial waters of Brazil by 25 April 2015, or such later date as agreed under Article 3.3 above, and in the opinion of the Buyer has no prospect of so doing so that the Funds cannot be released to the Seller, then title to the Cargo shall immediately pass back to the Seller and the Buyer shall promptly execute any necessary documents to effect this transfer. Insurable interest for the cargo shall remain with the Seller until the vessel leaves the territorial waters of Brazil.

4.3    The Seller will provide the Buyer with full sets of all original documents as first issued for the cargo at time of loading at Rio Grande, including full sets of original Mate's Receipts for the cargo as set out in Schedule 1 hereto. The Seller further warrants and confirms to the Buyer that no original B/L's were ever issued for the cargo and that to the best of their knowledge, no other document of title is in circulation or exists in respect to the Cargo now on board the ADAMASTOS.

4.4    Unless otherwise provided herein, the risk in the Cargo will pass from the Seller to the Buyer at the time the Seller receives payment in full of the sums identified at Article 2.1, it being expressly recognised that the Buyer does not receive the benefit of the insurance cover provided by Sompo Japan Nipponkoa Insurance Inc.

4.5    In the event that the Vessel is unable to leave Brazil the risk of the wasted expenditure by the Buyer under this agreement to facilitate the departure of the Vessel from Brazil will rest with the Buyer.

## Article 5.  Intentionally Left Blank

## Article 6.  Undertaking of the Buyer

6.1.    In consideration of this agreement, the Buyer undertakes to settle the following claims at its own





- 3 -

97

expenses in Brazil as soon as possible after receiving
written confirmation of the settlement figures and
terms from the prosecutor's office and or the court
officials.

   i.) Labour Court Claims and Crew claims up to maximum
       Brazilian Reals $ 4,828,203 (equivalent today to
       about US$ 1,609,401).

  ii.) The claims of Bunge in respect to the sequestrated
       funds held by the Brazilian State and Courts in the
       amount of Brazilian Reals $ 1.00 million. (equivalent
       to about US$ 333,000).

iii.)The Court fees of 4 % calculated on the figure of
       Brazilian Reals $ 3.00 mil (ie. Brazilian Real
       $ 120,000 or about US$ 40,000).

**6.2.**    Concurrent with the above Buyer warrants and undertakes
        to settle the claims arising in Brazil in connection
        with the Vessel or the Cargo as set out in Schedule 2
        hereto.

**6.3.**    The Buyer will, as soon as practicable, engage a tug
        for purposes of towing the ship out from Brazil on or
        before April 25th.

**Article 7.  Cooperation with the Underwriter's representatives**

**7.1.**    Underwriter's legal representatives in Brazil will
        attend and assist the Buyer and the Seller as far as
        possible to ensure that the Court duly acknowledges
        receipt of the Funds referred to in Article 6 and to
        ensure thereafter the cancellation of the auction.

**7.2**     For the avoidance of the doubt, Mr. Carlos Portugal
        Gouvêa is the local representative of the Buyer, who
        will endeavour to have the court proceedings withdrawn
        with the support of Underwriter's representatives in
        Brazil

**7.3**     In any event, should amounts other than those in
        Article 6 have to be paid by the Buyer prior to 11th
        March in order to cancel the auction, or should other
        amounts be required for payment to ensure the Vessel is
        free to leave Brazilian waters, such amounts shall be
        deducted from the purchase price stated in Article 2.1.
        Seller shall not be responsible or liable for any
        amounts paid in the event the purchase price is
        exhausted by any such payments. If amounts are deducted
        from the purchase price under this clause then, after
        agreement of the parties to the reduced purchase price





- 4 -

to the Seller, the balance remaining of the Funds held by K&L Gates LLP shall be promptly returned to the Buyer.

## Article 8.  Warranty

8.1.    THE SELLER WARRANTS THAT THE CARGO HAS BEEN FULLY PAID FOR BY THE SELLER AND IS BENEFICIALLY OWNED BY THE SELLER AT THE TIME OF THIS AGREEMENT AND THAT THE SELLER IS ABLE TO PASS GOOD BENEFICIAL TITLE TO THE BUYER. THE SELLER EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, CONCERNING THE CARGO, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## Article 9.  Waiver and Indemnity

9.1.    Save for the matters already disclosed to the Buyer the Seller is not aware of any other claim, demand or encumbrance currently existing against the Cargo.  To the extent that disclosure to the Buyer has previously been made, and subject to clause 7.3 herein the Seller shall not be liable for any cost, expense, loss, damage or liability arising out of or in relation to any claim made or threatened to be made by any third party based on any damage occurring or suspected to occur directly or indirectly out of the Cargo (collectively the "Liabilities"), including without limitation, a claim based on infringement of Cargo ownership by Bunge or overdue salaries or other labour rights by Adamastos's crew or unpaid price for goods, supplies or services provided to the owner of Adamastos by its creditors or court fees or other administrative costs by the relevant authorities.

## Article 10.  Limitation of Liability

10.1.   IN NO EVENT SHALL THE SELLER BE LIABLE TO THE BUYER, SUCCESSORS, TRANSFEREES OR ASSIGNS FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT LOSS OR DAMAGE, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, INCURRED BY OR CLAIMED AGAINST THE BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. THE BUYER HEREBY EXPRESSLY WAIVES AND FORGOES ANY RIGHT TO PUNITIVE, EXEMPLARY OR SIMILAR DAMAGES, IF ANY, THAT THE BUYER MIGHT HAVE AGAINST THE SELLER HEREUNDER OR





- 5 -

OTHERWISE. FURTHERMORE, IN NO EVENT SHALL THE SELLER'S
LIABILITY HEREUNDER OR OTHERWISE EXCEED THE PRICE OF
THE PRODUCTS SOLD HEREUNDER.

## Article 11.  Compliance

11.1.    The Buyer shall comply, and cause its customers, agents
and any other parties with which the Buyer has any
contractual relationship to comply, with all applicable
laws, orders and regulations in connection with the
transactions contemplated hereby. The Buyer hereby
represents and warrants that it has no reason to
believe that the Buyer and/or any other party, whether
or not the Buyer has any contractual relationship with
such party, has made or may make a violation of any
applicable law, order or regulation in connection with
transactions contemplated hereby.

## Article 12.  Term

12.1.    This Agreement shall become effective on the date
first above written.

## Article 13. Termination

13.1.    The Seller may forthwith terminate this Agreement by
notice to such effect to the Buyer if the Buyer commits
a breach of any term or condition contained in this
Agreement and fails to remedy the same within 21 days
after notice from the Seller setting out the nature of
such breach and demanding that the same be remedied;
provided, however, that if the Buyer fails to make any
payment due and payable to the Seller under this
Agreement, the Seller may forthwith terminate this
Agreement by notice to such effect to the Buyer without
requesting the Buyer to remedy such failure.

13.2.    The Seller may forthwith terminate this Agreement by
notice to such effect to the Buyer if bankruptcy,
insolvency, reorganization or rehabilitation
proceedings, or other proceedings analogous in nature
or effect, are instituted by or against the Buyer, the
Buyer is dissolved or liquidated, whether voluntarily
or involuntarily, a receiver or trustee is appointed
for all or a substantial part of the Buyer's assets,
the Buyer makes an assignment for the benefit of
creditors, or the Buyer generally suspends payment of
its debts when the same become due.



- 6 -



100

### Article 14.  Acceleration and Set-Off

14.1.    If any of the events described in Articles 13.1 and
         13.2 hereof has occurred with respect to the Buyer, the
         Seller shall be entitled to set off any amounts payable
         to the Seller by the Buyer under this Agreement,
         whether due or not, against those payable to the Buyer
         by the Seller under this Agreement.

### Article 15.  Rights and Obligations after Termination or Expiration

15.1.    No termination or expiration of this Agreement, for
         whatever reason, shall affect any right of the Seller
         or the Buyer which has accrued prior to the date of
         such termination or expiration.

### Article 16. Force Majeure

16.1.    The Seller shall not be liable in any manner for
         failure to perform or delay in performing all or any
         part of this Agreement, which is directly or indirectly
         due to any causes or circumstances beyond the control
         of the Seller, including, without limitation, acts of
         God, fire, flood, storms, earthquake, typhoon, tidal
         wave, tsunami, plague or other epidemics, governmental
         laws, other regulations, sanctions, or restrictions,
         war (whether declared or not), armed conflict,
         terrorism or the serious threat of the same,
         hostilities, mobilization, blockage, embargo, detention,
         revolution, riot, looting, lockout, strike or other
         labor dispute, unavailability of transportation, severe
         economic dislocation (including, but not limited to,
         the inability of the Seller to obtain an adequate
         supply of oil, gas, electricity or material with which
         to maintain its/their normal level of operations).

16.2.    If any event set forth in Article 16.1 above occurs,
         but subject to Article 3.3 herein, the Seller shall
         have the right, in its sole discretion, to terminate
         this agreement.

### Article 17.  Governing Law

17.1.    This Agreement shall be governed by and construed in
         accordance with the laws of England and Wales. This





- 7 -

101

Agreement shall not be governed by the United Nations
Convention on Contracts for the International Sale of
Goods, the application of which is expressly excluded.

## Article 18.  Arbitration

18.1.   All disputes, controversies or differences which may
        arise between the parties hereto, out of, in relation
        to or in connection with this Agreement or for the
        breach hereof or thereof, which cannot be resolved
        amicably by the parties within 30 days shall be finally
        settled by arbitration in London, England in accordance
        with the then existing Rules of Arbitration of the
        International Chamber of Commerce by three (3)
        arbitrators to be selected in accordance with said
        Rules. The arbitration shall be held in the English
        language.

18.2.   The award rendered therein shall be final and binding
        upon both parties.

## Article 19.  Entire Agreement

19.1.   This Agreement constitutes the entire agreement between
        the parties hereto regarding the sale and purchase of
        the Cargo and wholly cancels, terminates and supersedes
        all previous negotiations, agreements and commitments,
        whether formal or informal, oral or written, with
        respect to the subject matter hereof.

## Article 20.  Amendments

20.1.   This Agreement shall not be amended, changed or
        modified in any manner except by an instrument in
        writing signed by a duly authorized representative of
        the party against whom enforcement is sought.

## Article 21.  Assignment

21.1.   This Agreement shall be binding upon and inure to the
        benefit of the Seller and the Buyer, and their
        respective successors and permitted assigns.

21.2.   The Buyer shall not assign, transfer or otherwise
        dispose of its rights or obligations under this
        Agreement, in whole or in part.





- 8 -

## Article 22.  No Waiver

22.1.    No failure to exercise or delay in exercising any right
or remedy by the Seller under this Agreement shall
operate as a waiver thereof or of any other right or
remedy which the Seller may have hereunder, nor shall
any single or partial exercise of such right or remedy
preclude any further exercise thereof or of any other
right or remedy which the Seller may have hereunder.

22.2.    The rights and remedies provided herein are cumulative
and not exclusive of any rights and remedies provided
by law, in equity or otherwise.

## Article 23.  Severability

23.1    If any provision or any portion of any provision of
this Agreement is adjudged, by a court of competent
jurisdiction, to be invalid, illegal or unenforceable,
such provision or portion shall be deemed to be deleted
from this Agreement and the validity of the remaining
portions of this Agreement shall remain unaffected
thereby.

## Article 24.  Notices

24.1.    All notices, requests or other communications required
or permitted to be given hereunder shall be in writing
in the English language and shall be sent by registered
airmail letter, postage prepaid, or facsimile to the
other party at its address set forth below or to such
other address as may from time to time be notified by
one party to the other in accordance with this Article
24.1:


         If to the Buyer:

         Cargo Recovery Consultants Ltd.
         Harrow House, 23 West Street,
         Haslemere / Surrey GU27 2AB, UK.
         E mail: cargo.recovery@crc.net.uk
         Attention Malcolm Arrowsmith, and

         CRC Cargo Recovery Consultants S.A.
         6 Rue Neuve, 1260 Nyon, Switzerland.





- 9 -

E mail: crc@crcswiss.ch
Attention Mrs. Barbara Guner


Attention:
Facsimile No.:  00 44 1428 641100. And
Switzerland: 00 41 22 362-4831.



If to the Seller:

    Marubeni Corporation
    4-2, Ohtemachi 1-chome
    Chiyoda-ku, Tokyo 100-8088, Japan
    Attention:  F. Seyama
                / General Manager, Grain Dept.-I
    Facsimile No.: +81 3-3282-4753

24.2.   All notices shall be deemed to have been given when
        duly transmitted by facsimile or deposited in the mail.


**Article 25.  Headings**

25.1.   The headings of this Agreement are inserted for
        convenience of reference only and shall not affect the
        construction or interpretation hereof.


**Article 26.  Counterparts**

26.1.   This Agreement may be executed in two or more
        counterparts each of which shall be deemed an original,
        but all of which together shall constitute one and the
        same instrument.


        *This space below is intentionally left blank*



- 10 -

104

In Witness Whereof, the parties hereto have caused this Agreement to be executed by their respective, duly authorized representatives as of the day and year first above written.


Marubeni Corporation

Name: F. Seyama
Title: General Manager


CRC CARGO RECOVERY CONSULTANT S.A.

Name: Malcolm Arrowsmith
Title: Director



- 11 -

105